OF

## CASES ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF SOUTH CAROLINA.

HEARD APRIL TERM, 1871.

## REDDING *vs.* SOUTH CAROLINA RAILROAD COMPANY.

A master is responsible in a civil action for the tortious act of his servant committed in the course of the latter's employment, and it makes no difference that the act was done willfully and without the knowledge of the master, or even in disobedience of his orders.

Whether a servant was acting in the course of his employment when he committed a tortious act is a question of fact.

If there is no evidence at all to sustain the plaintiff's case, the Judge may order a non-suit; but if any such evidence is given, the case must go to the jury.

BEFORE GRAHAM, J., AT CHARLESTON, APRIL TERM, 1871.

Action by William F. Redding and Julia D. Redding, his wife, to recover damages for injuries to the person of the female plaintiff alleged to have been committed by a servant of the defendant at the depot of the defendant, in the city of Charleston, on the 26th February, 1870.

Mrs. Redding, the female plaintiff, Eliza Brown and Pharaoh Delair, were examined as witnesses for the plaintiffs, and each of them testified, in substance:

That while Mrs. Julia D. Redding was sitting in the ladies' parlor of the South Carolina Railroad Company Depot, at Charleston, in the said County, on the ———— day of February, 1870, a man, Charles Wollen, (who, being present in Court, was identified by the witnesses,) approached Mrs. Redding; told her she was a negro;

that he was instructed by the South Carolina Railroad Company to keep negroes out of that parlor; and, upon her refusal to leave the parlor, seized her and dragged her out, throwing her with violence to the floor upon her face (she being then pregnant,) thereby injuring her.

Mrs. Redding also testified that one month previously the same man, Charles Wollen, ordered her out of the same parlor, telling her he was ordered by the Company to keep negroes out of that parlor. Upon her saying she was not a negro, he apologized and left her. Mrs. Redding also testified that she rode in the first-class car, and, although without a ticket, and without paying any fare, was allowed to continue to her journey's end.

J. B. Martin was then called by plaintiffs. He testified as follows:

I am ticket agent at the South Carolina Railroad; was so in February last. One Wollen was employed as a man "knocking about" the depot. The first thing I employed him for was to attend the ladies' room, to clean it out. He was so employed in February. I do not remember the exact time of this occurrence. I discharged him, I presume, about two or three months after this occurrence. I gave no instructions to keep colored persons out of the parlors, and there were none at that time. That ceased to be as soon as the Civil Rights Bill had passed. I don't know when this Bill was passed, but it was before this. We never interfered with colored persons going in there.

Wollen's employment was, as we had no stewardess for the ladies' room, to keep it clean, sweep it out, and empty the chambers, and such things. That was the only employment he had, and the only authority. I am in charge of the whole premises. After the passage of the Civil Rights Bill, the orders were to make no distinction at all. Persons went in there as they pleased.

There is a passage here through the building. On the right hand side is the ladies' room, and my office is on the left. I cannot see into the ladies' room from my office. The ticket-window is all of twenty-five feet from the door of the ladies' room. I have never measured it. Mrs. Redding came to the window that night. She told me that she was ordered out of the ladies' room. I said it was without my knowledge or consent. I saw nothing more of her. There was a gentleman standing there. The first intimation I had of it was, he said that he would shoot my watchman. I asked him why? He then said that his foster sister had been ordered out of that

room.  I told him that it was done without my knowledge or consent. It was not my orders.  Nothing was said by Mrs. Redding, or any body with her, with regard to any violence.  She said she was ordered out.  No complaint was made to me of violence.  She said she had been in there several times before, and had not been ordered out.  I know that she has been in there and nobody disturbed her.  From the window she went to the cars.  At no time that night was any complaint made by her or anybody about any violence.

The plaintiffs here rested, and the defendant moved for a nonsuit, on the grounds:

That Charles Wollen was not acting within the scope of any employment or agency, direct or indirect, when he excluded plaintiff from the saloon, but was acting without authority, beyond his legitimate employment, and in violation of the instructions and wishes of the defendant, extended to its proper agents; and that, upon the testimony, the act was the tort of Charles Wollen, for which he is responsible, and not the Company.

The motion was granted.

The plaintiffs appealed to this Court, on the grounds:

1. That the defendants are liable, nothwithstanding that the servant acted contrary to their instructions, if he acted as their servant.

2. That the servant was acting in the course of his employment.

3. That whether the servant was acting in the course of his employment, was a question of fact, and should have been submitted to the jury to decide.

*Chamberlain, Seabrook & Dunbar,* for appellants, maintained the following propositions:

1. If Wollen was at the time acting as the servant of the respondents, but acted in violation of their orders, the respondents are unquestionably liable for his acts, unless they are shown to be willful or malicious.

2. The evidence shows that Wollen was at the time in the course of his employment, and hence the respondents are liable, in the absence of any evidence tending to show that he acted willfully or maliciously.

3. The question whether Wollen was at the time in the course of his employment is a mixed question of law and fact.  It was not competent for His Honor, the Circuit Judge, to pass upon the question, but it should have been submitted to the jury under proper instructions as to the matters of law involved.

They cited upon the first point—Story on Ag., § 452 ; *McManus* vs. *Crickett,* 1 East., 106 ; *Middleton* vs. *Fowler,* Salk., 282 ; *Wright* vs. *Wilcox,* 19 Wend., 343 ; *Richm. Turnp. Co.* vs. *Vanderbilt,* 2 Com., 479 ; *Joel* vs. *Morrison,* 6 C. & P., 511 ; *Sleath* vs. *Wilson,* 9 C. & P., 607 ; *Parkerson* vs. *Wightman,* 4 Strob., 363 ; *Weed* vs. *The Panama R. R. R. Co.,* 17 N. Y., 362 ; Story on Bailm., §§ 400, 406 ; *Stokes* vs. *Saltonstall,* 13 Pet., 181 ; Shearm. & Red. on Neg., 79 ; *Limpus* vs. *London Omnibus Co.,* 4 Hurl. & C., 526 ; *The Phil. & Read. R. R. Co.* vs. *Derby,* 14 How., 483. Upon the second point—1 Red. on Rail., 383, 512–13, notes, 3d Ed. ; *Phil. Railway* vs. *Witt,* 4 Whart., 143. And upon the third point—*Parks* vs. *Ross,* 11 How., 393 ; *Richardson* vs. *City of Boston,* 19 How., 268–9 ; *Brown* vs. *Frost,* 2 Bay., 126 ; *Hopkins* vs. *De Graffenreid,* 2 Bay, 441 ; 2 Bail., 321 ; *Magrath* vs. *Isaacs,* 2 McC., 23 ; *Clements* vs. *Benjamin,* 12 John. R., 299 ; *Pratt* vs. *Hull,* 13 John. R., 334 ; *Keller* vs. *The N. Y. Cent. R. R. Co.,* 24 How., Pr. R., 172.

*Conner,* contra, submitted the following points and authorities :

The general rule of law is, that the principal is liable for the acts of his agent, *in the course of his employment ;* but the rule and the limitation of it go together. The act complained of must be within the scope of the employment—within the agency.—Story on Agency, § 456.

The principal is not liable for the torts or negligence of his agent, in any matters beyond the scope of the agency, unless he has expressly authorized them to be done, or has subsequently adopted them for his own use or benefit.—Story on Agency, § 446 ; *McManus* vs. *Crickett,* 1 East., 106.

The fact that the servant was, at the time of the injury, engaged in the service of his master, is not conclusive of the master's liability. The act causing the injury must have been one within the scope of the authority which the servant had from the master, or which the master gave the servant reasonable cause to believe that he had, or which servants employed in the same capacity usually have.—Shear. & Red. on Neg., 70.

The language of C. J. Kenyon, in *Ellis* vs. *Turner,* is apposite : The defendants are responsible for the acts of their servant in those things that respect his duty under them, but are not responsible for his misconduct in those things that do not respect his duty to them, as *if he were to commit assault upon a third person* in the course of his voyage.—8 Term., 533. And to the same point is

*McClanahan* vs. *Brock*: " How can an act of one of the defendant's servants, outside of his employment, and in no way connected with it, be considered as the neglect of his bailment?" And the non-suit was sustained.—5 Rich., 27 ; *Eastern Counties R. R. Co.* vs. *Broom*, 2 Eng. Law & Equity, 406; *Crocker* vs. *New London & Willimantic R. R. Co.*, 24 Conn., 265; *Thames Steamboat Co.* vs. *Housatonic R. R. Co.*, Ibid, 56.

"It is objected that the defendants are not answerable for the tortious acts of their agents or servants, *and this is true, if the acts were accompanied with force,* for which an action *vi et armis* would lie, or were willfully done. But the acts complained of were not so done."—*Lowell* vs. *Boston & Lowell R. R. Co.*, 23 Pick., 24.

Alderson, J., in *McKenzie* vs. *McLeod,* 10 Bingham, 390; (25 E. C. L. R., 187): When the master "has neither ordered the thing to be done, nor allowed the servant any discretion as to the mode of doing it, I cannot see how, in common justice, or common sense, the master can be held responsible."

Aug. 29, 1871. The opinion of the Court was delivered by

WRIGHT, A. J. The action was brought by Redding and wife, the plaintiffs, to recover damages for an injury sustained by the wife in the passenger saloon of the defendant. The facts of the case are as follows : While the wife, on the evening of February, 1870, was sitting at the depot of the defendant in Charleston, in the parlor assigned for lady passengers, awaiting the departure of the train for Columbia, which she proposed to take, one Wollen, assuming to have charge of the said room, as the servant of the defendant, informed her that he was instructed to keep negroes out of that parlor ; and, on her refusal to leave, he seized and dragged her out with violence—throwing her on her face to the floor. About a month before, the same man had ordered her out of the parlor, saying that his instructions were to keep negroes out ; and, on being told by her that she was not a negro, he apologized, and further interference ceased. Martin, who had charge of the premises constituting the depot, testified : " That the first thing Wollen was employed for was to attend the ladies' room, to keep it clean, sweep it out, empty the chambers, and such things ; that this was his only employment; and orders had, before that time, been given to make no distinction at all "—meaning between white and colored persons. Wollen was discharged two or three months after the occurrence. Upon the plaintiffs' closing, the defendant moved

for a non-suit, on the grounds : " That Charles Wollen was not act-
ing within the scope of any employment or agency, direct or in-
direct, when he excluded plaintiff from the saloon, but was acting
without authority, beyond his legitimate employment, and in viola-
tion of the instructions and wishes of the defendant extended to its
proper agents ; and that, upon the testimony, the act was the tort
of Charles Wollen, for which he is responsible, and not the Com-
pany."

The motion was granted, and the plaintiffs seek, by appeal to
this Court, to reverse it. The relation of master and servant cre-
ates rights and obligations which are well defined in the books, not
only as between themselves, but as between themselves and third
persons. Perhaps, in regard to those last, they are no better or
more distinctly stated than in Smith on Master and Servant, 151–'2 :

" A master is ordinarily liable to answer in a civil suit for the
tortious or wrongful act of his servant, if those acts are done in the
course of his employment in his master's service. The maxim
applicable to such cases, being *respondeat superior*, and that before
alluded to, *qui facit per alium facit per se.* This rule, with some
few exceptions, is of universal application, whether the act of the
servant be one of omission or commission ; whether negligent, fraud-
ulent or deceitful ; or, even if it be an act of positive malfeasance
or misconduct, *if it be done in the course of his employment*, his mas-
ter is responsible for it, *civiliter*, to third persons ; and it makes no
difference that the master did not authorize, or even know of the
servant's act or neglect ; for, even if he disapproved of, or forbade
it, he is equally liable, if the act be done in the course of the ser-
vant's employment."

It would be a difficult undertaking to adduce a single case where
the master was not held bound for the tortious acts of his servant,
done in the course of his employment. That it was not authorized,
or even if it had been forbidden, does not affect the right of redress
against the master by a party injured by the unauthorized or for-
bidden act, for the consequence to the third party is the same, and
is to be attributed to the fact that the master has placed the ser-
vant in a position where he may do unauthorized acts. On what
principle of fairness could it be contended that either the error or
folly of employing an incompetent or careless servant, should bring
damage to a stranger, while the master, who put him in a position
where he might commit the wrong, should be free from all obligation
to respond to the injury ? The appointment of such improper person

by the master induced the wrong, and if it was committed in the course of his employment, that is, while the relation of master and servant actually existed in the particular service in the discharge of which the servant was engaged, the master is held to answer. He cannot be excused because he did not know of it or disapproved of it, or even had forbidden it, for, notwithstanding his conviction of the impropriety of the act, as shown by his forbidding it, he nevertheless was so careless and negligent, in the selection of his agent, as to subject the public to the chance of its infliction.

To confine the liability of the master only to such acts of his servant, in the course of his employment, as he may have authorized, would give to an irresponsible agent a license to commit torts against the persons of those who, by the nature of his employment, must be brought in contact with him, without any reasonable prospect of pecuniary redress, and would materially affect the subornation of the servant so necessary to the maintenance of the superior condition which the master holds in relation to him. When the community deal with a corporation of the character of this defendant, with diversified departments, and various branches of business incident to the general purpose of its organization, " public policy and convenience " require that they should be responsible for the acts of commission or omission by their agents while in the course of their employment. The Supreme Court of the United States, in *Philadelphia and Reading Railroad Company* vs. *Derby*, 14 Howard, 486, has affirmed the principles which we think applicable to this case, and, though not necessarily binding on this Court, yet the clear statement of the law in the opinion, having in view the reason on which it rests, and the authorities to which it refers, recommends it to our adoption. It was there held that " the master is liable for the tortious acts of his servant, when done in the course of his employment, although they may be done in disobedience of the master's orders." The " course of the employment," in the sense in which it is used in regard to the duties imposed by the particular service, is not to be understood as restricted and confined to the prescribed duties set apart for the performance of the servant. Whatever may be incident to the employment must necessarily belong to it. " To attend the ladies' room " (as Martin, in his examination in chief, says was the duty for which Wollen was employed,) might imply that he was to take charge of it, or, at least, to see to the seating and comfort of passengers who might enter; and this would further imply the duty of putting out improper

or disorderly persons, and of preventing entrance to an intruder. If, by error of judgment, he should forcibly and violently eject a party who had a right to be there, or, in like manner, prevent admission to one entitled to enter, would the defendant be excused upon the ground that he was not acting within the scope of his service? Lord Chancellor Cranworth, in *Marshall* vs. *Stewart*, (House of Lords,) 33 Eng. L. & E., 7, says: "We must take a great latitude in the construction of what is being engaged in his employment." That the act was willful, on the part of the servant, is no excuse for the master, if done within the course of his employment.

It was so held, in *Philadelphia and Reading Railroad Company* vs. *Derby*, in *Weed* vs. *Panama Railroad Company*, 17 N. Y., 362, in *Limpus* vs. *London Omnibus Company*, 1 Hurls. and Colt., 562, and in *Seymour* vs. *Greenwood*, 7 Hurls. and Nor., 354.

Every act is willful which is the result of volition. The principle proceeds upon the ground that the injury, by reason of the willful act, is to be attributed to the negligence and want of care of the master, in the selection of an improper servant, for a particular charge. There is a class of cases where the act of the servant was held not only willful, but malicious, or done to serve some purpose of his own, and the master was excused from liability. They are put upon the ground, that the servant was then acting out of the line of his employment. As in *McManus* vs. *Crickett*, 1 East, 107, where the servant, in driving his master's chariot, from malice ran it against the chaise of the plaintiff, in which he was riding, and from which he was thrown, and greatly hurt. Kenyon, C. J., delivering the opinion of the Court, said :

"Now, when a servant quits sight of the object for which he is employed, and without having in view his master's orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority *given* him, and, according to the doctrine of Lord Holt, his master will not be held answerable for such acts." In *Sleath* vs. *Wilson*, 9 Carr. and Payne, 607, Wilde, Serjt, in his argument, said : "The case of *McManus* vs. *Crickett* is quite a different case ; there the servant had a spite against the officer, and drove against him." Erskine, J., said : "It is quite a different case."

It would seem, from the ruling in *Seymour* vs. *Greenland*, 7 Hurls. and Nor, 335, that the English Courts had, to some extent, modified the views expressed in *McManus* vs. *Crickett.*

If, then, the issue between the parties before us was to be determined by the fact that Wollen was, or was not, acting in the course

of his employment, the solution of it was not for the Court, but for the jury. What was included in the course of his employment; what acts or duties the particular service demanded of him ; what control he was authorized to exercise over the passengers waiting in the parlor ; how far did his particular employment, "to attend the room, to keep it clean, sweep it out," &c., give him a right to interfere at all with passengers within it ; whether, having been in the room a month before the transaction, a hired servant, exercising the same authority as on this occasion, so far as ordering the plaintiff from the parlor, saying he was ordered by the Company to keep negroes out of it ; all these were circumstances from which the jury was to determine whether Wollen was, in the particular transaction, " in the course of his employment," after being instructed by the Court as to what, in legal contemplation, was understood by the term. When, however, the Judge assumed to decide that " Wollen was not acting within the scope of any engagement or agency, direct or indirect, when he excluded the plaintiff from the saloon, but was acting without authority, beyond his legitimate employment, and in violation of the instructions and wishes of the defendant, extended to its proper agents, and that, upon the testimony, the act was the tort of Charles Wollen, for which he is responsible, and not the Company," he undertook to decide an issue which properly belonged to the jury.

If there had been no evidence to sustain the plaintiff's complaint, it would have been within the legitimate province of the Judge to have said so, and to order the non-suit.

Who, however, can read the testimony, and say that, under no proper view which the jury could take of it, could they have differed from his conclusion? Our courts have not been inclined to grant non-suits where there was any evidence offered by the plaintiff which might sustain his action. Where there has been a total failure of testimony, as in *Brown* vs. *Frost,* 2 Bay, 126, and *Hopkins* vs. *De Graffenreid,* 2 Bay, 241, there was nothing to leave to the jury, and it was the duty of the Judge to non-suit; but, as is said in *Rogers* vs. *Madden,* 2 Bail., 321, the practice of " ordering a *non-suit in invitum,* for defective testimony, is to be pursued with caution. If a plaintiff has any *prima facie* testimony, he has the right to the verdict of a jury upon it."

The motion is granted, and the order set aside.

*Moses,* C. J., concurred.

WILLARD, A. J. While agreeing in the conclusion to which the majority of the Court has arrived, I do not deem it requisite to resort to the general rule, that the master is responsible to third persons for the wrongful act of his servant, as the ground of decision. Where there is no privity between the third person injured and the master, as it regards the transactions out of which the injury arose, it is necessary to refer to the rule of *respondeat superior*, in order to make the act of the servant, in its legal effect, an act of the master, and thus connect the latter with the damage sustained. But where the master is under an obligation to render a service to such third person, either imposed by law or the contract of the parties, and the damage sustained is a direct consequence of a wrong done in the rendition of such service, the master is liable for such damage, notwithstanding the particular act of the servant may have been unauthorized by the master, and have proceeded wholly from a malicious intent, on the part of the servant, to injure such third person. The wife of plaintiff presented herself to the defendants, a railroad corporation, as a passenger, to be conveyed over their railroad, and, so far as we can know, in conformity with the law, and the reasonable rules of the defendants, and must be regarded as entitled to enjoy the facilities and accommodations offered to passengers by defendants.

The damage claimed is alleged to have arisen, in part, from the act of defendant's servant, in ejecting her from a place where she had a right to be, under the relations she sustained, as a passenger, to the defendants, and in part from the degree of violence employed in the course of ejecting her. It is no answer to such a demand that the act of the defendants' servant was unauthorized, and willful and malicious on his part.

This principle was applied to the relations of a railroad company and a passenger, in the case of *Weed* vs. *Panama Railroad Company*, (17 N. Y., 362,) and is not affected by what is said in *Danner* vs. *South Carolina Railroad Company*, (4 Rich., 329,) of the effect of willful misconduct on the part of a servant, as affecting the relation of the master to third persons.